UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:13-cv-00176-MOC

| | |
|---|---|
| L.B., A MINOR, BY AND THROUGH HER GUARDIAN ANN BROCK, | ) ) ) |
| Plaintiff, | ) ) |
| Vs. | ) ) ORDER |
| UNITED BEHAVIORAL HEALTH, INC. WELLS FARGO & COMPANY HEALTH PLAN, | ) ) ) ) ) |
| Defendants. | ) |

**THIS MATTER** is before the court on cross motions for summary judgment. After fully briefing the issues, the court heard oral arguments during a bench trial of this matter.

Defendants contend that the final decision of the plan administrator denying plaintiff's claim for benefits at an out-of-state, acute in-patient psychiatric care facility should be affirmed as reasonable. Plaintiff contends that the plan administrator ("UBH") abused its discretion in denying her claim for in-patient care her daughter, "L.B.,"[1] received at the Menninger Clinic ("Menninger") were medically necessary as evidenced by the opinions of her treatment team at the Levine Children's Hospital ("Levine") in Charlotte as well as UBH's own Level of Care Guidelines. Plaintiff contends that immediately prior to presenting at Menninger, L.B. twice attempted suicide; that the second attempt was serious at it resulted in hospitalization at Levine and caused her to suffer a seizure; and that her team at Levine refused to release her to go home as she presented a danger to herself, releasing L.B. only to go directly to Menninger, where a bed was available.

---

[1] L.B. is no longer a minor; however, to protect her sensitive medical information, the court has not restyled the action and will continue to refer to the now real party in interest as L.B.

1

Earlier in this litigation, the court remanded the final decision to UBH to consider documents plaintiff contends were not previously considered. The court later modified that order to allow plaintiff to submit any materials she desired to present to the plan administrator. Upon remand, the plan administrator again denied benefits, a decision which was in turn reviewed by an independent review organization ("IRO") in accordance with the Affordable Care Act.[2]

I.

"The Employee Retirement Income Security Act of 1974" ("ERISA") allows plan participants or beneficiaries who are denied benefits under an employee benefit plan to challenge the plan administrator's denial in federal court. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). Unlike claims made on over-the-counter insurance plans that a consumer may acquire in the marketplace,

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan; it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a 'full and fair review' of claim denials, and it supplements marketplace and regulatory controls with judicial review of individual claim denials.

Id. at 115 (citations omitted). In the Fourth Circuit, a district court reviewing the final decision of a plan administrator

> must be guided by principles of trust law, taking a plan administrator's determination as 'a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries).' Second, courts must 'review a denial of plan benefits under a de novo standard unless the plan provides to the contrary.' Third, when the plan grants the administrator 'discretionary authority to determine eligibility for benefits ... a deferential standard of review is appropriate.' And fourth, '[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.'

---

[2] This court does not review the determination of the IRO, but instead considers the final decision of plan administrator.

Champion v. Black & Decker (U.S.), Inc., 550 F.3d 353, 358 (4th Cir.2008) (citation omitted).

## II.

The Wells Fargo & Company Health Plan ("Plan") gives the Plan Administrator UBH discretion in deciding questions of eligibility for benefits; thus, this court reviews such determinations for an abuse of discretion. See Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 629–30 (4th Cir. 2010). Under the abuse of discretion standard, a trial court will not disturb a plan administrator's decision if it is "reasonable." Id. at 630.

A decision is "reasonable" if it: (1) results from a deliberate, principled reasoning process; and (2) is supported by "substantial evidence." Id. In turn, substantial evidence is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. DuPerry v. Life Ins. Co. of North Am., 632 F.3d 860, 869 (4th Cir. 2011). In determining reasonableness, the Court of Appeals for the Fourth Circuit has held that courts should look to several factors, including: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motive and any conflict of interest it may have. Williams, 609 F.3d at 630.

Finally, this court's review is limited to the record that was before the plan administrator at the time of final determination. Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994) ("[A]n assessment of the reasonableness of the administrator's

3

decision must be based on the facts known to it at the time."). In accordance with Sheppard & Enoch, the court granted defendants' Motion *in Limine* to exclude live testimony at the hearing from L.B.'s physician and her mother.

III.

With such framework in place, the court has carefully considered the cross motions for summary judgment. Where cross motions for summary judgment are filed, such motions are

> no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

Wright & Miller, 10A Fed. Prac. & Proc. Civ.3d § 2720. In reviewing the arguments of the parties, the court has treated the motions and the citations of evidence in the administrative record in the manner it would a bench trial by first considering the evidence contained in the administrative record which plaintiff has cited in her favor and then considering the record evidence by defendant. See Stewart v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, 2012 WL 122362 (D.Md. 2012). For the reasons that follow, the court reverses the final decision of UBH and awards plaintiff benefits and attorneys' fees.

IV.

A.

In considering whether UBH's determination was reasonable, the court has first considered the facts surrounding L.B.'s attempts at suicide in 2011 as well as the opinions of her treating physicians in Charlotte, who ultimately recommended that she be treated at Menninger.

L.B.'s father was employed by Wells Fargo in Charlotte and died after a brief battle with esophageal cancer in the spring of 2011. By the fall of 2011, L.B. was returning to high school

4

as a junior, but plaintiff, L.B.'s mother, had noticed that L.B. was constantly depressed. In late September 2011, L.B. told plaintiff she had thoughts about physically harming herself and plaintiff immediately contacted L.B.'s pediatrician, who referred plaintiff to an adolescent psychologist. The psychologist, Dr. Melinda Harper, determined that L.B. was clinically depressed as a result of grief related to her father's death and referred L.B. on to a pediatric psychiatrist.

Because L.B. was unable to be seen by the psychiatrist immediately, and because of the pronounced effect that depression was having on plaintiff's schoolwork and other aspects of her life, her pediatrician prescribed[3] anti-depressant medication to help treat the clinical depression she was experiencing. On October 24, 2011, L.B. began seeing her psychiatrist and reported that she felt even more suicidal, and told her psychologist of a dream where she would stab herself with a knife. The psychiatrist prescribed additional anti-depressant medication.

On November 16, 2011, L.B. took eight REMERON (a tetracyclic antidepressant) in an attempted suicide. L.B. then told her mother that she had taken the pills, and plaintiff called 911 and L.B. was transported to the ER of Levine. At Levine, she was evaluated and treated by mental health professionals for her depression and suicide attempt. While there, L.B. was under the care of Dr. D.F. Lelio, Levine's Director of Child and Adolescent Psychiatry and Assistant Medical Director of Carolinas Healthcare Behavioral Health Center ("CBHC"). She was also under the care of Dr. Kerry T. Van Voorhis, the Director of Inpatient Medicine at Levine, and Dr. Mary Rogers, the Director of General Pediatrics Division at Levine. All three physicians determined that L.B. needed adolescent in-patient psychiatric care. However, because of a shortage of facilities providing this treatment in Charlotte, L.B. would have to wait 48 hours before she could be admitted to CBHC in Charlotte. Dr. Lelio remained as L.B.'s treating

---

[3]  The court takes notice that a psychologist cannot prescribe controlled medication.

physician while at CBHC and L.B. was discharged after five days of inpatient care.

A week after discharge and only 11 days after her first suicide attempt, L.B. again attempted suicide on November 27, 2011, this time taking a whole bottle of CELEXA (an antidepressant in a group of drugs called selective serotonin reuptake inhibitors). As she had with her previous suicide attempt, L.B. told plaintiff what she had done and this time plaintiff rushed L.B. to CBHC, which then transported L.B. to the Levine ER. While in the ER, plaintiff suffered a seizure and almost died. The same team of physicians placed L.B. in Levine's pediatric intensive care unit on suicide watch and L.B was also monitored by her adolescent psychologist, Dr. Harper.

L.B. remained at Levine for a week. Together her doctors evaluated the type of psychiatric treatment that was necessary for L.B., and they determined that she needed intensive adolescent residential psychiatric treatment, a facility that was non-existent in Charlotte. They further ruled out a return to CBHC based on failure of her earlier treatment at that facility, the severity of L.B.'s depression, and her continued suicide attempts. Her treatment team recommended to plaintiff that L.B. be admitted to Menninger in Houston, Texas, for intensive psychiatric therapy. Drs. Van Voorhis, Rogers and Lelio recommended the Menninger because of its special adolescent treatment program for major depression and suicidality, the fact that it had immediate bed availability, and the fact that previous local in-patient treatment was unsuccessful. The treatment team told plaintiff that failure to provide this care could result in continued suicide attempts and possible death. After plaintiff agreed to such placement, L.B. was then released to travel immediately with her mother by air to Menninger.

After some five weeks of treatment, L.B. was discharged and has since returned to the normal life of a young adult with no further attempts to take her own life. The bill for such stay

and treatment at Menninger amounted to less than $24,000.00.

B.

As will be discussed at greater length, UBH denied plaintiff's request for reimbursement for the care L.B. received at Menninger. After exhausting her plan remedies, plaintiff filed this action, which the court initially remanded. Upon remand, plaintiff provided UBH with additional sworn statements from Drs. Rogers, Harper, and Van Voorhis, but on April 4, 2014, UBH again denied plaintiff's claim.

C.

The Plan document does not itself establish specific criteria for a Plan participant to be entitled to benefits for inpatient mental health treatment. Rather, Section 4.1 of the Plan provides as follows:

> [t]he applicable schedules of benefits provided under the Plan are set forth in the Insurance Policies and/or Summary Plan Descriptions for the Plan and are incorporated into and made a part of this Plan Statement.

AR 1179-1206 (copy of Plan document). Plaintiff argues that recent decisions from the Supreme Court and the Fourth Circuit make it clear that documents outside the Plan, even summary plan descriptions ("SPDs"), do not provide terms which this court can enforce even if those extra-Plan documents are incorporated by the Plan by reference. UBH argues that without being able to incorporate by reference external documents, a benefits plan would become unwieldy and it was not the intent of the Supreme Court or the appellate court to prohibit the originator of the plan, in the plan document itself, from incorporating extrinsic documents such as SPDs.

A participant's rights and responsibilities with respect to a plan emanate from the plan document: "summary documents, important as they are, provide communication with

beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)." CIGNA Corp. v. Amara, 131 S.Ct. 1866, 1878 (2011). Further, a plan administrator does not have the right to both administer the plan and "to set plan terms indirectly by including them in the summary plan descriptions." Id. (citation omitted). While plaintiff argues that the Amara Court held that "summary plan descriptions and other external documents do not constitute a plan's terms and cannot be incorporated by reference" (plaintiff's Brief in Support at 11), close review of the Amara decision does not support that argument as the Court never held that a Plan document could not *incorporate by reference* a summary plan document. Indeed, plaintiff's reading of Amara is inapposite to the concurrence of Justice Scalia, who wrote that "[a]n SPD is separate from a plan, and cannot amend a plan *unless the plan so provides*." Amara, 131 S. Ct. at 1883 (Scalia, J., concurring) (emphasis added). Thus, Amara in no way prohibits Plan from specifically incorporating SPDs or other extra-Plan documents.

At its core, Amara stands for the proposition that ERISA requires courts to enforce the language of the plan, not the language of plan summaries. Id. at 1876–77. As to the role of summary plan documents, the Court held that those documents "provide communication with beneficiaries *about* the plan, but … their statements do not themselves constitutes the terms of the plan…." Id. at 1878 (emphasis in the original). Terms in a summary plan document that *conflict* with the plan itself are not enforceable. Id. at 1876-77.

Arguably, when the Amara decision is viewed without the concurrence of Justice Scalia, the question of whether a plan can incorporate by reference summary or other extra-plan documents by reference remains open. Other courts addressing similar post-Amara questions have held that terms not contained in the plan and which do not conflict with the plan, are

8

enforceable where the extra-plan language is "authorized by, or reflected in" the plan itself. Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey, 663 F.3d 1124, 1131 (10th Cir.2011); see also Holmes v. Colorado Coalition for Homeless Long Term Disability Plan, ___ F.3d ___, 2014 WL 3906853 (10th Cir. Aug. 12, 2014). Another district court has addressed the issue presented here more directly, holding as follows:

> The ERISA requirement that the Plan be reflected in a "written instrument" is "to ensure that participants are on notice of the benefits to which they are entitled and their own obligations under the plan." *Wilson v. Moog Auto., Inc. Pension Plan*, 193 F.3d 1004, 1008 (8th Cir.1999) (*citing*, inter alia, *Curtiss–Wright Corp.*, 514 U.S. at 83, 115 S.Ct. at 1230). However, there is no requirement that the written instrument be comprised of only a single document. *Wilson*, 193 F.3d at 1008. Therefore, documents that are expressly referenced in and incorporated into the Plan document can constitute part of the Plan. *Id.* at 1008–09 (plant closing agreement negotiated by union and employer included among the plan documents). *See also Palmiotti v. Metro. Life Ins. Co.*, 423 F.Supp.2d 288, 299 (S.D.N.Y.2006) ("ERISA provisions do not restrict the number or the kinds of documents that can constitute a written plan"; LTD Booklet part of the official plan documents).

Tetreault v. Reliance Standard Life Ins. Co. 2011 WL 7099961, 8 (D.Mass. Nov. 28, 2011). Thus, applying Amara to the situation presented here, it would appear that terms appearing in documents which the Plan incorporates by reference are enforceable under ERISA.[4] Thus, the 2011 Summary Plan Description (AR 0615-0674) (the SPD effective at the time of L.B.'s admission) and terms contained therein are enforceable as part of the Plan inasmuch as the Plan specifically incorporates the SPD. In relevant part, the 2011 SPD provides as follows:

> Residential treatment services are provided in a facility or a freestanding residential treatment center that provides overnight mental health services for individuals who do not require acute inpatient care but who do need 24-hour medical supervision. To be covered, the center must include an adequate educational program, as determined by UBH at its discretion, for school-aged children and adolescents. Admission to a residential treatment center is not

---

[4] Such a reading of *Amara* is also consistent with contract law, which has been traditionally applied to ERISA. "A document, even one that is not contemporaneous, may be incorporated by reference into a contract so long as "the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt." 11 *Williston on Contracts* § 30:25 (4th ed.) (citations omitted).

9

>intended for use solely as a long-term solution or to maintain the stabilization acquired during treatment in a residential facility or program.

AR 0669.

The 2011 SPD also requires that mental health treatment be medically necessary, id., which plaintiff does not challenge, and permits UBH to develop internal guidelines to determine whether a claim meets the "medically necessary" standard provided by the plan. Plaintiff contests the applicability of those guidelines. Here, UBH utilized its own "Level of Care Guidelines" ("LCG"). While plaintiff contends that the LCG is also extrinsic to the Plan and should not have been considered, the court finds that use of such guidelines is clearly appropriate under the Plan and the SPD as the LCG help provide UBH with a framework for rational decision making. LCGs provide decision makers with current best medical practices in a field of medicine which is constantly evolving, as evidence by the multiple iterations of the DSM.

### D.

UBH having won the battle over what documents control post-Amara, the court turns to the more substantive analysis of whether the denial of plaintiff's claim was reasonable. In reviewing plaintiff's claim, UBH engaged two board certified psychologists to review L.B.'s medical history (one of whom did so telephonically with L.B.'s attending physician) and created a risk assessment profile. Utilizing the Level of care Guidelines, each psychologist concluded that L.B.'s condition did not call for treatment at the full inpatient level of care for her mental condition, as she did not pose an imminent risk of harm to herself, among other things. On remand, a board-certified psychiatrist reviewed the claim and plaintiff's additional supporting documentation and recommended denying the claim, finding that L.B.'s her condition did not warrant the full inpatient level of care. Pivotal to such final determination was information gathered from risk-assessment forms used at Menninger, wherein L.B. self-reported that

although she still harbored suicidal ideations, she had no plan for carrying those thoughts out.

As to the review process, Dr. Ghosh, a board certified psychiatrist who completed L.B.'s initial review, determined that L.B.'s condition failed to satisfy the 2011 Level of Care Guidelines for Mental Health Inpatient Admission. Dr. Sane, a board certified child, adolescent, and adult psychiatrist, affirmed Dr. Ghosh's conclusion, finding that L.B.'s condition warranted, at most, partial inpatient care. Dr. Uy also found that acute inpatient treatment was not medically necessary after reviewing her updated claim, which contained additional documents.[5] It is undisputed that the doctors UBH consulted reviewed L.B.'s medical history, her past suicide attempts, her passive ideations while at Menninger, her contract with her doctors not to harm herself, her family history, and the prescription medication she was taking.

While there is no "treating physician rule" in ERISA cases that would requires deference to the opinion of a treating doctor, there was a great deal of compelling information from L.B.'s doctors in North Carolina, all of whom firmly believed that admission to Menninger was a medical imperative. L.B.'s treating psychiatrist, Dr. Harper, who followed her throughout her illness, opined:

> In [L.B.]'s case, the reason for having her at Menninger Clinic is that she did have a high risk of a third suicide attempt, even after she was stabilized on medication following the second suicide attempt. Based on my medical experience and treatment of adolescents, adolescents who have attempted suicide more than once and have ongoing depression or other mental health problems (as did [L.B.]) are at a very high risk of another or even continued suicide attempts until they can receive appropriate and more comprehensive treatment for their underlying mental health condition (in [L.B.'s] case, major depressive disorder), which often serves as a driver for suicide attempts. [L.B.] needed to be at an inpatient facility while she was receiving treatment precisely because she needed

---

[5] The IRO, MES Solutions, Inc., found that L.B.'s inpatient stay at the Menninger Clinic "was clearly elective and not medically necessary," because her "behaviors [were] not acutely dangerous and indicated family conflicts and issues that would be more appropriate for an outpatient level of care." A decision of an IRO is subject to review as it is not the decision of the plan administrator; rather, it is relevant to whether the decision of the plan administrator was reasonable. *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000).

to be watched and under constant care so that she did not have an opportunity for yet another suicide attempt.

AR 1213. Dr. Lelio, who treated L.B. at Levine and CBHS, refreshingly admitted that her own care of L.B. at CBHS had failed, that a return to CBHS would not be effective, and that treatment at Menninger was not only a medical necessity, but saved L.B.'s life:

> [L.B.] continued to have active suicidal ideations until she was stabilized on a revised psychotropic medication regimen. It was determined that she needed more intensive inpatient hospitalization for treatment of the major depression and that she was high risk for a repeat suicide attempt. Since psychiatric hospitalization locally had been unsuccessful and there was a paucity of adolescent beds available in North Carolina, other psychiatric programs appropriate for adolescents with major depression and suicidality were explored. Menninger Clinic had such a program and an available bed so she was subsequently transferred. In my opinion, this transfer has been life-saving for [L.B.] Given the gravity of her clinical situation and failure to find local inpatient resources addressing her needs, it was necessary to find treatment at an appropriate facility with an available bed.

AR 1223-1227, 1233-1237.

UBH argues that denying coverage was reasonable because "[t]he information considered by UBH provides ample evidence for a trained psychiatrist to conclude that L.B. did not meet any of the six coverage criteria for mental health inpatient treatment." Defendants' Response (#123) at 17-18. UBH level-of-care guidelines provide that acute inpatient care is warranted when "***any one*** *of six criteria"* are met:

1. Serious and imminent risk of harm to self or others due to a behavioral health condition, as evidenced by, for example:
    a. Recent and serious suicide attempt(s) as indicated by the degree of intent, impulsivity, and/or impairment of judgment.
    b. Current suicidal ideation with intent, realistic plan and/or available means, or other serious life threatening, self-injurious behavior(s).
    ...
2. Serious and acute deterioration in functioning from a behavioral health condition that significantly interferes with the member's ability to safely and adequately care for themselves in the community.
3. Severe disturbance in mood, affect, or cognition that results in behavior that cannot be managed safely in a less restrictive environment.

4. Imminent risk of deterioration in functioning due to the presence of severe, multiple and complex psychosocial stressors that are significant enough to undermine treatment at a lower level of care.
5. Recommended behavioral health treatment of a member with a serious medical condition requires 24–hour management.
6. Community support services that might otherwise augment ambulatory mental health services and avoid the need for hospitalization are unavailable.

(#104-6).

As discussed at oral arguments, the most relevant of the six criteria contained in the 2011 Level of Care Guidelines was the first, which asks whether "[t]he member is at imminent risk of serious harm to self…." Def. Ex. #104-7. Under that guideline, there are seven examples of what constitutes an imminent risk, with the first being recent and serious attempts at suicide, and the second being suicidal ideation with a plan. The court cannot quibble with UBH's determination that plaintiff did not meet Criteria 1(b) inasmuch as it is clear that once she arrived at Menninger, L.B., while continuing to have suicidal ideation, lacked a plan.

As to Criteria 1(a), however, the court can find no evidence in the administrative record which even suggests that L.B.'s suicide attempts were neither "recent" nor "serious." Indeed, the overwhelming evidence from L.B.s treatment team is that her suicide attempts occurred in close temporal proximity to each other and her admission to Menninger and that they were very serious attempts as "she nearly died." Missing from UBH's decision and its argument is a reasonable explanation of why coverage was not provided under Criteria 1(a), as the LCG only requires that "any one of the following criteria must be met….." While the court fully concurs with UBH that L.B. did not meet 1(b), UBH was obligated to grant coverage under the LCG upon plaintiff meeting "any one" of the six criteria. A fiduciary that glosses over an analysis that would direct an award in favor of an analysis that would support denial of benefits does not engage in a principled and reasoned decision making process.

13

V.

Clearly, the determination of UBH is unreasonable as UBH failed to follow its own Level of Care Guidelines and grant coverage under Criteria 1(a). At the time of her admission to Menninger, the evidence is unrefuted that L.B. presented a serious and imminent risk of harm to herself based on recent and serious suicide attempts. If failure to meet Criteria 1(b) was all that was needed to deny coverage, the court would fully concur in UBH's decision. The LCG is, however, written in the disjunctive and UBH and the doctors it hired ignored the precise part of UBH own guidelines which would have *mandated* coverage for L.B.'s treatment.[6] A straightforward reading of the LCG mandates coverage where any one criteria is met, not denial where any one criteria is not met.

As a fiduciary adjudicating benefits claims, UBH is tasked with acting "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits." 29 U.S.C. § 1104(a)(1)(A). As a fiduciary, UBH must act "with an eye single" to plaintiff's interest as a participant in the Plan. DeFelice v. U.S. Airways, Inc., 497 F.3d 410, 419 (4th Cir. 2007). Indeed, the Level of Care Guidelines do not in any manner require that a claimant meet all six criteria or all seven examples under Criteria One, but point to coverage where <u>any</u> criteria is met. As the court pointed out at the hearing, it does not take a panel of psychiatrists to determine that L.B.'s two suicide attempts were both recent and serious at the time she presented at Menninger.

Finding that UBH acted unreasonably when it denied plaintiff's claim, the court will,

---

[6] Such unprincipled and unreasonable claims review by UBH in applying these very Level of Care Guidelines does not appear to be isolated. *See Pacific Shores Hosp. v. United Behavioral Health*, --- F.3d ----, 2014 WL 4086784 (9th Cir. Aug. 20, 2014) ("All of the errors support denial of payment; none supports payment. The unhappy fact is that UBH acted as a fiduciary in name only, abusing the discretion with which it had been entrusted.").
.

14

therefore, reverse the final determination of UBH and award plaintiff the requested benefits and attorneys' fees under 29 U.S.C. § 1132(g).

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendants' Motion for Summary Judgment (#113) is **DENIED**, plaintiff's Motion for Summary Judgment (#115) is **GRANTED**, the final decision of the Plan Administrator denying plaintiff's claim for benefits is **REVERSED**, and plaintiff is awarded benefits as applied for under the Wells Fargo & Company Health Plan.

Within 14 days, plaintiff shall file a Motion for Attorneys' Fees, accompanied by documentation required for an award of fees in this district, which includes lodestar information as to hours billed and the billing attorney's ordinary hourly rate and experience, and an affidavit from an outside practitioner or statistical data supporting that rate in this particular area of law in this community. The court encourages counsel to meet, confer, and resolve the issue of attorneys' fees.

Signed: September 16, 2014

Max O. Cogburn Jr.
United States District Judge